## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) | Case No. 19-41940-CJP |
| MPAC HOME IMPROVEMENT AND | ) |  |
| CONSTRUCTION, LLC, | ) |  |
| Debtor | ) |  |
|  | ) |  |
|  | ) |  |
| JONATHAN R. GOLDSMITH, | ) |  |
| CHAPTER 7 TRUSTEE, | ) |  |
| Plaintiff | ) | Adv. Pro. No. 21-4033-CJP |
| v. | ) |  |
|  | ) |  |
| PADRAIG O'BEIRNE, MARY E. | ) |  |
| O'BEIRNE, SUDBURY PROPERTY | ) |  |
| MANAGEMENT, LLC, AND COLONIAL | ) |  |
| PARK KITCHENS, LLC, | ) |  |
| Defendants | ) |  |
|  | ) |  |

## MEMORANDUM OF DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT OF MARY E. O'BEIRNE AND RELATED MOTIONS

In an amended complaint [Dkt. No. 33] (the "Amended Complaint"), Johnathan R. Goldsmith, as chapter 7 trustee (the "Trustee") of the bankruptcy estate of MPAC Home Improvement and Construction, LLC (the "Debtor"), has asserted claims against several defendants, including Mary E. O'Beirne ("O'Beirne"). There are ten (10) counts in the Amended Complaint, nine (9) of which are asserted against O'Beirne[1]: (a) the avoidance of allegedly fraudulent transfers, based on both actual and constructive fraud (Counts I–V), (b) the recovery of those transfers under 11 U.S.C. § 550[2] (Count VI), (c) unjust enrichment (Count VII), (d) alter ego (Count IX), and (e) breach of fiduciary duty/corporate waste (Count X).

---

[1] O'Beirne's spouse, Padraig O'Beirne, is also a defendant in this matter and shall be referred to as "Padraig" or "P. O'Beirne" in this memorandum and order (the "Memorandum").

[2] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended (the "Bankruptcy Code" or "Code").

Before the Court are (i) the motions filed by O'Beirne (a) for summary judgment [Dkt. No. 69] (the "SJ Motion") and (b) to strike [Dkt. No. 84] (the "Motion to Strike") the Trustee's *Response to Defendant's Statement of Undisputed Facts and Plaintiff's Statement of Facts That Preclude Summary Judgment* [Dkt. No. 79] (the "Trustee SOF"), and (ii) the opposition to the Motion to Strike and cross-motion to strike filed by the Trustee [Dkt. No. 89] (the "Cross-Motion to Strike") portions of O'Beirne's reply to the Trustee's opposition to the SJ Motion [Dkt. No. 82] (the "O'Beirne Reply").[3]  O'Beirne seeks summary judgment in her favor on each count in which she is named as a defendant in the Amended Complaint.  After considering the foregoing, all responses, the affidavits filed by the parties, the arguments of counsel at a hearing, and the record in this case, the Court grants in part and denies in part the SJ Motion, grants in part the Motion to Strike, and denies the Cross-Motion to Strike.[4]

## I.   LEGAL STANDARD

When the moving party demonstrates that there is no genuine dispute of material fact as to a claim, that party "is entitled to judgment as a matter of law" and summary judgment shall enter.  *See* Fed. R. Civ. P. 56(a).  "As to issues on which the nonmovant has the burden of proof, the movant need do no more than aver an absence of evidence to support the nonmoving party's case. . . . The burden of production then shifts to the nonmovant, who, to avoid summary judgment, must establish the existence of at least one question of fact that is both 'genuine' and 'material.'"  *Desmond v. Varasso (In re Varasso)*, 37 F.3d 760, 763 n.1 (1st Cir. 1994) (internal quotations and citations omitted).  A fact is material if it "might affect the outcome of the suit

---

[3] O'Beirne also filed a *Statement of Undisputed Facts* [Dkt. No. 70] ("O'Beirne SOF"), to which the Trustee responded in the Trustee's SOF.

[4] While I may cite to specific supporting evidence in the record, my findings are often supported by other evidence in the record, and I do not intend to limit support for my findings to the cited portion of the record.

under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   "For

the purpose of summary judgment, an issue of fact is genuine if it may reasonably be resolved in

favor of either party." *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir. 1997) (internal quotations

and citation omitted).

"The court must examine the record in the light most favorable to the nonmoving party

and must make all reasonable inferences in that party's favor." *Vazquez-Velazquez v. Puerto

Rico Highways & Transp. Auth.,* 73 F.4th 44, 50 (1st Cir. 2023).   Summary judgment should not

be granted "where evidence of record in [a] case is 'sufficiently open-ended to permit a rational

factfinder to resolve the [liability] issue in favor of either side.'" *Coyne v. Taber Partners I*, 53

F.3d 454, 457 (1st Cir. 1995) (quoting *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731,

735 (1st Cir. 1995)).   Ultimately, the Court's role is limited to assessing whether there exists

evidence such that a fact finder could find for the nonmoving party.  *Perry v. Roy,* 782 F.3d 73,

78 (1st Cir. 2015).

## II.   DISCUSSION

### A.  Fraudulent Conveyance Related Claims (Counts I–VI)

Counts I and II of the Amended Complaint seek to avoid transfers under § 548 of the

Bankruptcy Code, and Counts III, IV, and V seek to avoid transfers under Massachusetts General

Laws chapter 109A ("Chapter 109A").   Count VI seeks to recover the avoided transfers.   The

Trustee asserts that O'Beirne received transfers that were both actually and constructively

fraudulent and that evidence in the record, and reasonable inferences therefrom, demonstrate a

genuine issue of material fact as to whether O'Beirne received: 1) as a fifty-percent member of

co-defendant Sudbury Property Management, LLC ("SPM"), the benefit of all direct transfers

made from Debtor to SPM as well as Debtor's payments of SPM's mortgage, taxes, utilities,

insurance, and attorneys' fees (collectively, the "SPM Transfers")[5];  2) $50,000 from the

Debtor's Bank of America  account ending in -0706 (the "-0706 Account") deposited to the

O'Beirnes' joint savings account on March 29, 2018, *Declaration of Richard B. Reiling* [Dkt.

No. 80] ("Reiling Decl."), Ex. Z;  3) $8,000 (the "$8,000 Transfer") from the -0706 Account

deposited to the O'Beirnes' joint checking account on May 16, 2018, Reiling Decl., Ex. AA;  4)

$5,000 (the "$5,000 Transfer") from the Debtor deposited in the O'Beirnes' joint bank account at

Bank of America on May 13, 2019, *Affidavit of Padraig O'Beirne* [Dkt. No. 72] ("P. O'Beirne

Aff.") ¶ 32;  5) two $10,000 transfers (the "$10,000 Transfers" and, collectively with the $5,000

Transfer, the "$25,000 Transfers") on May 17, 2019, deposited in the O'Beirnes' joint bank

accounts at Bank of America, P. O'Beirne Aff. ¶ 33; 6) $75,000.00 at an unspecified time as

repayment for funds that she claims to have advanced to the Debtor for the Debtor's project for

Deborah Race and James LaPlante, Reiling Decl., Ex. C, Mary O'Beirne Dep. Tr., October 21,

2022 ("O'Beirne Dep."), at 107:18-24, 108:1-7; and (7) certain transfers alleged to have paid the

personal expenses of the O'Beirnes set forth in paragraphs 39 and 43 of the Amended Complaint

for calendar years 2018 and 2019, respectively (the "Personal Expense Transfers").[6]

---

[5] The SPM Transfers are comprised of the following amounts the Trustee asserts the Debtor transferred either to SPM or on SPM's behalf while the Debtor was insolvent: (a) SPM's gas and electric bills totaling $27,515.36 in 2018, Trustee SOF at 22–23, ¶ 40; (b) direct transfers to SPM and payments for SPM's contractors, taxes and attorneys totaling $16,051.80 in 2018, *id*. at 22, ¶ 38; (c) SPM's gas and electric bills totaling $4,529.75 in 2019, *id*. at 27, ¶ 56; and (d) SPM's mortgage, insurance, and direct payments to SPM totaling $10,177.95 in 2019, *id*. at 26–27, ¶¶ 55, 57.

[6] I will refer to all of the foregoing transfers, collectively, as the "Transfers."  The Amended Complaint does not contain any reference to either the $50,000 transfer or the $75,000 transfer.  In addition, regarding the Personal Expense Transfers,  the Trustee alleges "the O'Beirnes utilized Debtor's assets and the deposits paid by Debtor's customers to directly pay for their household and personal expenses, including vehicle payments and meals and entertainment. The funds of Debtor were likewise utilized to pay Mr. O'Beirne's personal credit cards." Amended Compl. ¶ 18..  The Trustee further alleges that "at a time when the O'Beirnes were well aware of the aforementioned customer claims and the Debtor's insolvency, the O'Beirnes purposely diverted the limited cash resources of Debtor—including monies earmarked for Debtor's construction projects—to the payment of the O'Beirnes' personal expenses and the expenses of the East Main Property."  *Id*. at ¶ 39; *see also id*. at ¶ 44.

Section 548(a)(1)(A) permits a trustee to avoid a transfer made or an obligation incurred by a debtor within two years of the petition date if made "with actual intent to hinder, delay, or defraud" creditors.  11 U.S.C. § 548(a)(1)(A).  Under Chapter 109A, the look-back period is four years.  *See* Mass. Gen. Laws ch. 109A, § 10.  A trustee must prove actual intent at the time of the transfer or incurrence of the obligation.  *See Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254 (1st Cir. 1991); *see also Fed. Deposit Ins. Corp. v. Anchor Props.*, 13 F.3d 27, 31–32 (1st Cir. 1994) (interpreting Chapter 109A, § 7).

Because a bankruptcy trustee may not have access to direct evidence of the actual intent to hinder, delay or defraud creditors, I may look to "badges of fraud" to establish such intent based on circumstantial evidence.  *Max Sugarman Funeral Home*, 926 F.2d at 1254.  The United States Court of Appeals for the First Circuit (the "First Circuit") has identified certain factors to assess fraudulent intent:

> (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; . . . (3) insolvency or other unmanageable indebtedness on the part of the debtor; . . . (4) a special relationship between the debtor and the transferee; and, *after the transfer*, . . . (5) retention by the debtor of the property involved in the putative transfer.

*Id.* at 1254 (internal citations omitted).  While the presence or absence of any single badge of fraud is not conclusive, "the confluence of several [of these factors] can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose."  *Id.* at 1254–55.

The analysis under Chapter 109A § 5(a)(1) is analogous to the analysis under § 548(a)(1)(A) of the Bankruptcy Code.  *See* Mass. Gen. Laws ch. 109A, § 5(b) (setting out non-exhaustive list of factors to consider when determining actual intent to defraud); *see also Cruickshank v. Blast Fitness Group, LLC (In re Blast Fitness Grp., LLC)*, 602 B.R. 208, 224 (Bankr. D. Mass. 2019) (applying Chapter 109A § 5(a)(1) and analogous provisions of

Bankruptcy Code § 548(a)(1)(A) to permit a finding of intent to defraud where, for example, "a transferee is in a position of dominance or control over a debtor's disposition of property, such that the transferee's intent to hinder, delay, or defraud creditors may be imputed to the debtor so as to render the transfer fraudulent.").

Section 548(a)(1)(B) of the Bankruptcy Code provides that a trustee may also avoid any transfer of a debtor's interest in property made within two years before the filing of a bankruptcy petition if the transfer was constructively fraudulent. *See* 11 U.S.C. § 548(a)(1)(B). The elements necessary to establish a constructive fraudulent transfer pursuant § 548(a)(1)(B) are, in pertinent part: (1) a transfer; (2) of an interest of the debtor in property; (3) that occurred within two years prior to the filing of the petition; (4) for which the debtor received less than a reasonably equivalent value in exchange for the transfer; and (5) the debtor was insolvent at the time of the transfer. *Tomsic v. Pitocchelli (In re Tri-Star Techs. Co.)*, 260 B.R. 319, 323 (Bankr. D. Mass. 2001) (citing § 548(a)(1)(B)). Section 544(b) also permits a trustee to assert state law fraudulent conveyance claims and "wear the mantel of any actual unsecured creditor who could have avoided a prepetition transfer under 'applicable [non-bankruptcy] law.'" *Id.* at 323–24 (alternation in original).

The Trustee has also asserted claims under Chapter 109A §§ 5(a)(2) and 6(a), which, in relevant part, provide:

Section 5.

(a) A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . if the debtor made the transfer . . .:

. . .

(2) without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Section 6.

(a) A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . . .

Mass. Gen. Laws ch. 109A, §§ 5(a)(2), 6(a). As this Court has previously observed:

The analysis of what constitutes "reasonably equivalent value" under the relevant sections of the Massachusetts UFTA mirrors the analysis of "reasonably equivalent value" under 11 U.S.C. § 548, *see Tri–Star*, 260 B.R. at 324; *Riley v. Countrywide Home Loans Inc. et al. (In re Duplication Mgmt., Inc.)*, 501 B.R. 462, 481–84 (Bankr. D. Mass. 2013), which has been described as follows:

[C]ourts have uniformly held that a reasonably equivalent value determination should be based on all of the facts and circumstances of the case. The Court should "compare what was given with what was received." And, in making this determination, both direct and indirect benefits should be considered. It is not necessary that there be an exact exchange in order to establish reasonably equivalent value, but the Court "must keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity between the value received and the obligation assumed ... will have significantly harmed ... innocent creditors.

*Tri–Star*, 260 B.R. at 325–26 (internal citations omitted).

*Baldiga v. Moog, Inc. (In re Comprehensive Power, Inc.)*, 578 B.R. 14, 33 (Bankr. D. Mass.

2017).

I will focus on the elements of each claim where the parties disagree whether there is

sufficient evidence in the record to support a given element.

     i.   *Actual Intent*

First, O'Beirne argues that there is no evidence cited by the Trustee that can refute her

statements that she was not involved in causing the Debtor to make the transfers to the joint

accounts she maintained with her husband.  She concedes that certain badges of fraud are present as related to the Debtor, but states that none of those could apply to her.

Even so, as the transferee, O'Beirne's intent is irrelevant for purposes of § 548(a)(1)(A) because it is only the Debtor's intent to "hinder, delay, or defraud" creditors that is material. *See, e.g.*, *Grochocinski v. Schlossberg (In re Eckert)*, 388 B.R. 813, 830 (Bankr. N.D. Ill. 2008) aff'd sub nom. *Grochocinski v. Schlossberg*, 402 B.R. 825 (N.D. Ill. 2009)) ("the intent of the transferee is immaterial" under § 548(a)(1)(A)).  There is some ambiguity in applicable case law regarding the materiality of a transferee's intent under Chapter 109A § 5(a)(1)(A):

> It is less clear whether Massachusetts courts view a transferee's knowing participation in the debtor's intentional fraud as a necessary ingredient of an actual fraudulent conveyance claim.  *Cf. Frank Sawyer Tr. of May 1992 v. Comm'r*, 712 F.3d 597, 603, 607 (1st Cir. 2013) (indicating that section 5(a)(1) concerns transferee's intent but later suggesting transferee's knowledge of transferor's intentions is "irrelevant"); *Bakwin v. Mardirosian*, 467 Mass. 631, 6 N.E.3d 1078, 1081 n.2, 1083–85 (2014) (holding that innocent transferees may be added as "relief defendants" in UFTA actions and affirming reconveyance order against good-faith transferee who took from transferor harboring actual fraudulent intent).

*Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 38 (1st Cir. 2020) (recognizing ambiguity in the context of examining whether a material difference exists between the law of Connecticut, which provides in certain circumstances that "a transfer is not actually fraudulent in the first instance unless the plaintiff can show that the conveyance was made with a fraudulent intent in which the grantee participated" and Massachusetts on the transferee knowledge element under their respective enactments of the Uniform Fraudulent Transfer Act, *id*.).

Because Chapter 109A is silent on whether a transferee's intent is considered, there are cases which suggest it would be "appropriate to turn to cases decided under the corresponding section of the Uniform Transfer Act and the Bankruptcy Code."  *See, e.g., Butler v. Wojtkun (In re Wojtkun)*, 534 B.R. 435, 456 (Bankr. D. Mass. 2015) (looking to cases under the corresponding section of the Uniform Transfer Act as adopted in other jurisdictions and the Bankruptcy Code to

determine the meaning of "reasonably equivalent value" for purposes of constructively fraudulent transfers under Chapter 109A § 6(a) and quoting Mass. Gen. Laws ch. 109A, § 12 in support of this approach ("This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states which enact it")).  However, the Court need not reach the relevance of a transferee's knowledge to a claim under Chapter 109A under § 5(a)(1)(A) of Chapter 109A because whether the Trustee's evidence of O'Beirne's intent is sufficient is only part of the inquiry.  There is adequate evidence in the record of badges of fraud from which inferences could be drawn of actual intent by the Debtor, as transferor, at least through Padraig O'Beirne, such that there are genuine issues of material fact as to this element relating to the Transfers.  Trustee SOF at 24–31, ¶¶ 45–72. Notably, the Debtor failed to list transfers to the O'Beirnes' joint account in its Schedules and Statement of Financial Affairs.

     *ii.    The Transfers*

     Each of the Transfers must be considered separately.  O'Beirne asserts that the payment of her portion of the tax refunds to the Debtor resulting from jointly filed returns with her husband was the result of a mistake and the $25,000 Transfers corrected that mistake.  She contends that the Debtor's estate never had an interest in those funds, and she never intended to give her share of the tax refunds to the Debtor.  *Affidavit of Mary E. O'Beirne* [Dkt. No. 71] ("O'Beirne Aff.") ¶ 35.  The record shows that O'Beirne signed tax returns that directed tax refunds to be deposited in the Debtor's account.  O'Beirne Aff. ¶ 34; P. O'Beirne Aff. ¶ 31.  The O'Beirnes' 2018 Internal Revenue Service tax return resulted in a tax refund of $40,486 and the 2018 Massachusetts Department of Revenue tax return resulted in a in a tax refund of $10,374. O'Beirne Aff. ¶ 33; P. O'Beirne Aff. ¶ 30.  It is undisputed that these refunds were electronically deposited into a bank account of the Debtor on May 15, 2019, and May 9, 2019, respectively.

Trustee SOF at 12–13, ¶¶ 39–40.  It is also undisputed that the $5,000 Transfer occurred on May

13, 2019, and the two $10,000 Transfers occurred on May 17, 2019.  *Id*. at 13–14, ¶¶ 42–43.

While O'Beirne's assertions regarding her intention as to the tax refunds may be found to be

true, the undisputed facts that O'Beirne signed a return directing payment of refunds to the

Debtor, Reiling Decl., Ex. LL, and the $25,000 Transfers were made in three round number

deposits over several days, with reasonable inferences taken in favor of the Trustee, demonstrate

that genuine issues of material fact exist with respect to the $25,000 Transfers as to whether the

proceeds of the tax refunds became property of the Debtor when delivered or when co-mingled

in the Debtor's account.

      With respect to the $50,000 transferred by the Debtor to the O'Beirnes' joint savings

account on March 29, 2018, that specific transfer is not mentioned in the Amended Complaint or

the SJ Motion, but is stated as a fact in the Trustee's SOF and supported by an exhibit.  *See*

Trustee SOF at 11, ¶ 34; Reiling Decl., Ex. Z.  In the response to the Trustee's SOF filed as an

exhibit to the Motion to Strike, O'Beirne states that she does not have sufficient information to

respond to the Trustee's asserted undisputed fact, even though the $50,000 was deposited into

her joint account with Padraig O'Beirne at Bank of America.  Mot. to Strike, Ex. A at ¶ 48.  She

also states that the "fact is not relevant to the claims alleged by the Trustee and does not preclude

summary judgment."  *Id.*  In the Motion to Strike, O'Beirne requests that the Court strike the

Trustee's SOF on the basis that the Trustee "attempts to include transfers and information that is

outside the scope of the Amended Complaint[.]"  Mot. to Strike ¶ 7.

      At oral argument, counsel for O'Beirne asserted that, after the statute of limitations had

passed, the deadlines for amendment in the case management order had expired, and a motion

for summary judgment had been filed, the Trustee has now asserted "new claims."  Counsel to

the Trustee responded that the Trustee was not attempting to move the goal posts and that

O'Beirne was on notice of the claims.  The Trustee points to a footnote with a table of alleged

transfers in the Amended Complaint that states that "[a]dditional transfers may be discovered as

although the Trustee has received certain bank records, additional discovery is necessary,

including obtaining third party records."  Amended Compl. ¶ 39 n.4; *see also* ¶ 44 n.9 (same).

He also points to certain prayers for relief in the Amended Complaint that do not reference any

specific Counts where he requests that the Court enter judgment "[a]voiding all fraudulent and/or

preferential transfers of Debtor's property to Defendants" and "[r]ecovering all fraudulent and/or

preferential transfers of Debtor's property to Defendants."  Amended Compl. at 27, ¶¶ 11–12.

Rule 15(c) of the Federal Rules of Civil Procedure, as made applicable by Rule 7015 of

the Federal Rules of Bankruptcy Procedure, governs the amended pleading of claims that "relate

back" to a timely filed original pleading.  *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 541

(2010); *see also Grella v. Zimmerman (In re Art & Co., Inc.)*, 179 B.R. 757, 763 (Bankr. D.

Mass. 1995) (considering "fair notice of the claims that are added in the amendment").  General

reservation of rights to assert discovered claims may not satisfy Rule 15(c).  *See, e.g.*, *Burtch v.

Dent (In re Circle Y of Yoakum, Tex.),* 354 B.R. 349, 357 (Bankr. D. Del. 2006) (finding that a

statement in original complaint that "Trustee reserves his right to amend this Original Complaint

to include . . . additional Transfers . . . and for the Amendments to relate back to this Original

Complaint[,]" standing alone, did not provide sufficient notice of claims because "a factual

nexus must exist between the conduct or transactions alleged in the amendment and those alleged

in the original pleading" to satisfy Rule 15(c), otherwise, a trustee could just "declare that the

opposing party ha[d] sufficient notice of any amendment he may make to that complaint.").  "In

the context of preference or fraudulent transfer actions, courts have found the existence of a

factual nexus (i.e., transactions arising from the same pattern of conduct), and thus allowed

relation back, where a series of payments are made in equal amounts at uniform periodic

intervals." *Id.*

I have struggled with how to address the request for summary judgment as to the

fraudulent transfer claims asserted in the Amended Complaint that do not include transfers

asserted as material facts by the Trustee for the first time in the Trustee's SOF filed in opposition

to the SJ Motion.  It should not be left to the Court to imagine the Trustee's allegations regarding

the "unpleaded" transfers as part of the claims asserted in the context of summary judgment.

Under some circumstances, however, it seems possible for a trustee to assert additional transfers

in an amended complaint should it satisfy Rule 15(c):

> New avoidance claims are generally treated as separate, distinct transactions that
> do not relate back under Rule 15(c). . . . However, just as claims arising from the
> same "basic scheme" relate back, so too do newly pleaded avoidance claims that
> arise from the same "course of conduct" pleaded in the original complaint. . . .
> Consequently, the Additional Transfer claims will relate back if: (1) the Amended
> Complaint alleges that the Additional Transfers were part of a course of conduct
> alleged in the Original Complaint; and (2) the Original Complaint notified the
> parties, against whom the Additional Transfer claims are asserted, that the Trustee
> could pursue avoidance of the Additional Transfers associated with the course of
> conduct alleged in the Original Complaint.

*Shapiro v. Wall St. Health Servs. (In re Uplift RX, LLC)*, 625 B.R. 364, 376 (Bankr. S.D. Tex.

2021) (internal citations omitted).

On this record, it is not evident that the Trustee has pleaded a fraudulent conveyance

claim with respect to the $50,000 transfer.  I will grant the Motion to Strike to the extent that the

Trustee's SOF purports to preserve or assert a claim to recover the $50,000 transfer without

prejudice to the Trustee filing a motion to further amend the Amended Complaint wherein he can

either properly address the standards for amending a complaint to include claims developed

during discovery that would otherwise be time-barred by a statute of limitations, or assert

another basis for amendment such as equitable estoppel of the statute of limitations if facts would support such a position.[7]

The $75,000 transfer presents the same issue—and another. Not only is the transfer not identified in the Amended Complaint, but the Amended Complaint also has no specific Counts seeking recovery of preferential payments. The Trustee again points to general request for relief that references "preferential transfers." Amended Compl. 27. The Amended Complaint does not contain allegations regarding "antecedent debt" or other specific elements of § 547. "Numerous courts have permitted plaintiffs who originally alleged that a pre-bankruptcy transfer was preferential to later re-categorize that same transfer as a fraudulent conveyance." *Grede v. MBF Clearing Corp.*, No. 09 C 5214, 2018 WL 306668, at *5 (N.D. Ill. Jan. 5, 2018) (collecting cases). Courts have considered whether transfers identified as avoidable preferences provide sufficient notice of a possible fraudulent conveyance claim and even whether "newly pleaded avoidance claims that arise from the same 'course of conduct' pleaded in the original complaint." *In re Uplift RX, LLC*, 625 B.R. at 376 (internal citation omitted). The Trustee has stated that, during O'Beirne's deposition, the Trustee learned that O'Beirne advanced $75,000 to the Debtor in 2019 for a project and had been repaid that amount. Trustee SOF at 25, ¶ 51 (citing O'Beirne Dep. at 107:18-24, 124:20-23). The deposition testimony of O'Beirne was that she knew that she received some money back, but that she was not sure how much or "where the money came from." O'Beirne Dep. at 108:9-23. She "assum[ed] it would have been" from the Debtor. O'Beirne Dep. at 108:22-23. The Trustee offers no other evidence of a transfer. Again, on this

---

[7] In the Cross-Motion to Strike, the Trustee argues that O'Beirne "attempts to ambush Plaintiff by interjecting the following arguments for the first time in her reply: (1) that she did not benefit from the payment of SPM's expenses; (2) that certain transfers are barred by the statute of limitations; and (3) that the Trustee may not attempt to assert a claim under Chapter 547 of the Bankruptcy Code." Cross-Mot. ¶ 11. There is no adequate basis to separately strike those components of O'Beirne's Reply and the Court overrules the untimeliness arguments. The Cross-Motion to Strike is denied and the Court has determined the Motion to Strike on substantive grounds as described herein.

record—where the first mention in a pleading of the $75,000 transfer or of a specific preference

claim is in a pleading opposing summary judgment—the Trustee has not pleaded a claim that the

SJ Motion could address.  In determining a summary judgment motion, it should not fall on the

Court to mine for claims and consider issues more properly raised in a motion for leave to further

amend the Amended Complaint.  I will grant the Motion to Strike to the extent that the Trustee's

SOF purports to preserve or assert a claim to recover a $75,000 preferential transfer without

prejudice to the Trustee seeking authority to further amend the complaint.

With respect to the payment of Padraig O'Beirne's credit cards and the Personal Expense

Transfers, the record does not demonstrate that O'Beirne ever used any of the Debtor's or

Padraig O'Beirne's credit cards, including his corporate American Express credit card, or had

any specific direct benefit from the use of those cards.  *See* O'Beirne Aff.,  ¶¶ 14–15; P.

O'Beirne Aff., ¶¶ 15–16.  Accordingly any transfers associated with these credit cards cannot be

the basis for claims as to O'Beirne.

The $8,000 Transfer was referenced in the Amended Complaint and is supported by

evidence in the record.  Amended Compl. ¶ 39; Reiling Decl., Ex. AA.  I have ruled that there is

sufficient evidence in the record that an inference could be drawn that the Debtor intended to

hinder delay or defraud creditors by making this transfer.  There is also evidence in the record

supporting the elements of a constructively fraudulent conveyance under § 548 or applicable

state law.  O'Beirne asserts that the record does not show that she received the transfer or the

benefit of the transfer.  While O'Beirne's affidavit states that she had no knowledge of this

transfer or benefit from this transfer, the evidence that the $8,000 was deposited in a joint

account where O'Beirne was a signatory is sufficient to create a genuine issue of material fact.

Perhaps O'Beirne did not "benefit" from the transfer into her joint account, but she was a direct

transferee and had the right to withdraw those funds.  Taking inferences in favor of the Trustee, a

14

genuine issue of material fact exists to be determined at trial such that summary judgment would not be appropriate as to the $8,000 Transfer.  It is also notable that, when addressing the $25,000 Transfers, O'Beirne states that, when the tax refunds were deposited into the Debtor's account, she "asked Mr. O'Beirne to transfer one-half (1/2) of [those deposits] to her."  Trustee SOF at 13–14, ¶¶ 42–43.  It is undisputed that the amounts claimed by O'Beirne to have been transferred to her as the result of those requests were deposited in the same joint Bank of America account as the other transfers alleged by the Trustee.

Finally, the Trustee asserts a claim against O'Beirne regarding transfers by the Debtor to or for the benefit of SPM.  The Trustee contends that O'Beirne directly benefited from transfers to or for the benefit of SPM because she was a fifty percent member of SPM.  Aside from the "alter ego" claim asserted by the Trustee, the Trustee does not allege that O'Beirne was the actual transferee of the SPM Transfers.  Section 550 permits a trustee to recover an avoided transfer from "a person for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1).  Chapter 109A § 9(b)(1) permits a judgment for an avoided fraudulent transfer to be entered against "the person for whose benefit the transfer was made."  Mass. Gen. Laws ch. 109A, § 9(b)(1).

The mere fact that O'Beirne is a member of SPM does not mean that she benefited from the Debtors transfers to SPM as shareholder status alone does not equate to a benefit having been conferred.  *See, e.g.*, *Gowan v. Amaranth LLC (In re Dreier LLP)*, 452 B.R. 451, 466 (Bankr. S.D.N.Y. 2011) (mere fact that one entity was party in control of initial transferee does not in itself mean controlling party benefited from transfers to initial transferee); *Tulis v. Gordos N. Rest. Corp. (In re Gordos Rest. Corp.)*, 643 B.R. 1, 35 (Bankr. S.D.N.Y. 2022) ("Reliance solely on the shareholders' status as such, without additional evidence of the transfer's direct benefit to them thus is insufficient."); *Turner v. Phoenix Fin., LLC (In re Imageset, Inc.)*, 299 B.R. 709,

718 (Bankr. D. Me. 2003) (holding shareholders not liable by virtue of shareholder status as

"[t]he benefit must derive directly from the transfer, not from the use to which it is put by the

transferee"). "In order to establish liability for a transferee for whose benefit the transfer was

made, the benefit must be direct, ascertainable and quantifiable and must correspond to, or be

commensurate with, the value of the property that was transferred. . . . Incidental, unquantifiable,

or remote allegations of benefit are not sufficient." *In re Dreier LLP*, 452 B.R. at 466 (internal

quotations and citations omitted). In response to O'Beirne's statement that she received no

benefit from any transfers to SPM, the Trustee alleges, without citing to the record, that

> Ms. O'Beirne received the benefit of all direct transfers made from Debtor to
> SPM as well as Debtor's payments of SPM's taxes, utilities, insurance and
> attorney's fees . . . . Ms. O'Beirne, as [fifty percent] equity owner and control
> person of SPM, directly benefited from the payment of the mortgage, insurance
> and utility payments on her "investment" property.

Trustee SOF at 11, ¶¶ 34–35. The Trustee appears to be arguing that O'Beirne benefited from

transfers to or for the benefit of SPM because of her fifty percent interest in SPM. She was not

an immediate or mediate transferee of SPM. Of course, she may have benefited as a member of

SPM from transfers to or for the benefit of SPM, but the Trustee does not cite to specific

evidence in the record that she actually did benefit or that the benefit has been realized. It may

be that SPM, as transferee, is liable to the estate for some or all of the transfers alleged by the

Trustee, in which case O'Beirne would have received no enhanced value of her membership

interest if those amounts are recovered by the Trustee. The Trustee does not cite to evidence in

the record or any authority to support his claims that O'Beirne could be liable on a fraudulent

transfer theory for transfers made to SPM or that a genuine issue of material fact exists with

respect to any such claim. The reference to O'Beirne considering the real estate as her personal

"investment" property does not change that conclusion given the record.

The SJ Motion is denied in part as to all fraudulent conveyance claims to recover the

$8,000 Transfer and the $25,000 Transfers from O'Beirne and granted in part as to all fraudulent

conveyance claims to recover from O'Beirne the amounts transferred by the Debtor to or for the

benefit of SPM and to pay credit card bills that may have included personal expenses.  Because

the Amended Complaint does not assert claims to recover the $50,000 transfer or the $75,000

transfer, the Motion to Strike is granted in part to the extent the Trustee's SOF purports to assert

those claims, without prejudice to the Trustee filing a motion to further amend the Amended

Complaint and the defendants filing an opposition thereto.

### B.  Unjust Enrichment (Count VII)

"Unjust enrichment is defined as retention of money or property of another against the

fundamental principles of justice or equity and good conscience."  *Sacks v. Dissinger*, 178

N.E.3d 388, 397 (Mass. 2021) (internal quotations and citations omitted).  "Unjust enrichment is

an equitable remedy, which 'exist[s] to supplement those available at law and not to contradict

the judgments embodied in the statutes and the common law.'" *Tomasella v. Nestle USA, Inc.*,

962 F.3d 60, 82 (1st Cir. 2020) (quoting *Stevens v. Thacker*, 550 F. Supp. 2d 161, 165-66 (D.

Mass. 2008)).  Therefore, "'a party with an adequate remedy at law cannot claim unjust

enrichment.'"  *Id.* (quoting *Shaulis v. Nordstrom*, Inc., 865 F.3d 1, 16 (1st Cir. 2017)); *see also*

*Scarpaci v. Lowe's Home Ctr., LLC*, 212 F. Supp. 3d 246, 253 (D. Mass. 2016); *The Maids Int'l,*

*Inc. v. Ward (In re Ward)*, 194 B.R. 703, 712 (Bankr. D. Mass. 1996) ("Doubts as to the

adequacy of the remedy at law are resolved in favor of granting equitable relief."); *Bank of Am.,*

*N.A. v. Diamond Fin., LLC*, 42 N.E.3d 1151, 1156–57 (Mass. App. Ct. 2015) (quoting *Cadigan*

*v. Brown*, 120 Mass. 493 (1876)) (explaining that "courts . . . have limited even express grants of

equitable authority to situations where there is no 'plain adequate and complete remedy at

law.'").  "It is the availability of a remedy at law, not the viability of that remedy, that prohibits a

claim for unjust enrichment." *Shaulis*, 865 F.3d at 16.  The First Circuit has summarized the

standard to demonstrate unjust enrichment under Massachusetts law:

> In Massachusetts, a claim for unjust enrichment does not require consideration,
> but there must be "unjust enrichment of one party and unjust detriment to another
> party." . . . *see also* 26 Samuel Williston & Richard A. Lord, *A Treatise on the
> Law of Contracts* § 68:5 (4th ed. 1993) (establishing that unjust enrichment
> requires: (1) a benefit conferred upon the defendant by the plaintiff; (2) an
> appreciation or knowledge by the defendant of the benefit; and (3) acceptance or
> retention by the defendant of the benefit under the circumstances would be
> inequitable without payment for its value); . . .  Massachusetts courts emphasize
> the primacy of equitable concerns in a finding of unjust enrichment or quasi-
> contract: "[C]onsidertions of equity and morality play a large part in constructing
> a quasi contract."  [*Salamon*, 477 N.E.2d at 1031].

*Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc*., 552 F.3d 47, 57 (1st Cir. 2009)

(internal citations omitted).

O'Beirne asserts that the Trustee does not allege and no evidence in the record supports:

"(a) that the Debtor reasonably expected compensation from O'Beirne, and (b) that O'Beirne

accepted the benefit with the knowledge of the Debtor's reasonable expectation."  Mot. to Strike

at 15.[8]  At oral argument, the Trustee disputed that "reasonable expectation of compensation" is

---

[8] O'Beirne asserts that, to prove unjust enrichment, the Trustee must show "(1) [the Debtor] conferred a measurable
benefit upon the defendant; (2) [the Debtor] reasonably expected compensation from the defendant; and (3) the
defendant accepted the benefit with the knowledge, actual or chargeable, of the [Debtor's] reasonable expectation."
SJ Mot. 14 (quoting *Stewart Title Guar. Co. v. Kelly*, 146 N.E.3d 1142, 1151 (Mass. App. Ct. 2020).  The cases she
cites in support and other cases citing the same unjust enrichment elements appear to involve quasi-contract related
claims for unjust enrichment where a remedy of quantum meruit is also sought.  *See Stewart Title*, 146 N.E.3d at
1151 (breach of contract case); *Finard & Co., LLC v. Sitt Asset Mgmt.*, 945 N.E.2d 404 (Mass. App. Ct. 2011)
(same); *see also*, *Columbia Plaza Assocs. v. Ne. Univ.*, 227 N.E.3d 999, 1018 (Mass. 2024) (same); *Wendt v.
Barnum*, 2007 Mass. App. Div. 93, 95–96 (Mass. Dist. Ct. 2007) (requesting quantum meruit relief).  While unjust
enrichment and quantum meruit are sometimes referred to interchangeably, they are distinct concepts.  *See
Lockwood v. Madeiros*, 506 F. Supp. 3d 73, 80 (D. Mass. 2020).  "Quantum meruit is a species of unjust
enrichment."  *Bisbano v. Strine Printing Co.*, 737 F.3d 104, 109 n.2 (1st Cir. 2013).  However, courts do typically
treat these two claims together "because, under Massachusetts law, these quasi-contract claims are treated similarly
and have the same elements."  *Ratchford v. Orange Lantern, Inc.*, No. CV 19-30092-MGM, 2024 WL 1093050, at
*9 (D. Mass. Mar. 13, 2024) (quotations and citations omitted).  This appears to have led to some cases adopting an
unjust enrichment standard that includes a reasonable expectation element where quantum meruit is also at play.
Quantum meruit typically involves provision of goods and services.  *See* Restatement (Third) of Restitution and
Unjust Enrichment § 49 cmt. f (2011) ("Liability in restitution for the market value of goods or services is the
remedy traditionally known as quantum meruit.").  Here, the Transfers at issue do not fit squarely under a quantum
meruit theory that would justify applying a quasi-contract equitable remedy.  Accordingly, here, the Court would
consider the three similar—though distinct—factors for "this more general cause of action" under unjust enrichment
and apply the standard set forth in *Mass. Eye & Ear Infirmary* discussed above.  Ultimately, the contours of the
unjust enrichment standard are irrelevant because under either unjust enrichment is not available where there is an

an element of an unjust enrichment claim.  The Trustee asserts evidence showing O'Beirne

"personally accepted" the transfers that are the subject of the fraudulent conveyance Counts

under the facts and circumstances of this case is sufficient to demonstrate genuine issues of

material fact that would preclude summary judgment.  *Opposition of John R. Goldsmith* [Dkt.

No. 78] ("Trustee Opp.") 9.  Given my rulings above, however, this claim could only relate to

the $8,000 Transfer and the $25,000 Transfers.  I do not need to reach the question of law

presented by the positions of the parties.    The unjust enrichment claim is based on the same

facts and circumstances as the surviving fraudulent conveyance claims against O'Beirne.  As

there is an adequate remedy at law, I grant summary judgment in favor of O'Beirne on Count

VII.

### C.  Alter Ego / Piercing the Corporate Veil (Count IX)

The Trustee seeks to hold O'Beirne jointly and severally liable for the debts of the Debtor

by asserting that the Debtor, SPM, and the O'Beirnes should be treated as a single entity.

Amended Compl. ¶ 129.  O'Beirne asserts that the Trustee cannot present a single piece of

evidence that she controlled, or even participated in, the management and operation of either the

Debtor or SPM.

Under Massachusetts law, the corporate veil will be pierced only in rare situations to

prevent gross inequity.  *See Birbara v. Locke*, 99 F.3d 1233, 1239 (1st Cir. 1996); *see also My

Bread Baking Co. v. Cumberland Farms, Inc.*, 233 N.E.2d. 748, 751–52 (Mass. 1968).  Piercing

the corporate veil is appropriate when "the parent exercises 'some form of pervasive control' of

the activities of the subsidiary 'and there is some fraudulent or injurious consequence of the

intercorporate relationship,'" *Scott v. NG U.S. 1, Inc.*, 881 N.E.2d 1125, 1132 (Mass. 2008)

---

adequate remedy at law.

(quoting *My Bread Baking Co.*, 233 N.E.2d at 752), or when "there is a confused intermingling

of activity of two or more corporations engaged in a common enterprise with substantial

disregard of the separate nature of the corporate entities," *My Bread Baking Co.*, 233 N.E.2d at

752.

Generally, individuals "may be held liable where they control the operation of the

corporation and run it for their personal benefit, and where justice requires that the separate

existence of the corporation be ignored."[9] *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754

F.2d 10, 15 (1st Cir. 1985). Although the standards for piercing the corporate veil are normally

described in terms more applicable to corporations, they apply equally to individual defendants.

*See George Hyman Constr. Co. v. Gateman*, 16 F. Supp. 2d 129, 149–50 (D. Mass. 1998)

(recognizing  application of veil piercing standard to individuals, even though some factors may

be better suited to corporate versus individual defendants in assessing application); *Riley v.

Tencara, LLC (In re Wolverine, Proctor & Schwartz, LLC)*, 447 B.R. 1, 36 (Bankr. D. Mass.

2011) (determining that "the same principles would apply for alter ego liability to attach to

members of limited liability companies" (citation omitted)).

Courts applying Massachusetts law look to twelve factors to determine whether

corporate entities should be disregarded: "(1) common ownership; (2) pervasive control; (3)

confused intermingling of business activity, assets, or management; (4) thin capitalization; (5)

nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of

dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning of corporate

assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of

---

[9] "The doctrines of veil piercing, reverse veil piercing and alter ego are interrelated[,] and litigants often use the terms interchangeably." *Butler v. Candlewood Rd. Partners, LLC (In re Raymond)*, 529 B.R. 455, 471 (Bankr. D. Mass. 2015). "Nevertheless, veil piercing and alter ego can be distinguished." *The Patriot Grp., LLC v. Fustolo (In re Fustolo)*, 597 B.R. 1, 47 (Bankr. D. Mass. 2019). "The former asks a court to hold A vicariously liable for B's debts, while the latter asserts that A and B are the same entity and therefore liability is direct." *U.S. Trustee v. Zhang (In re Zhang)*, 463 B.R. 66, 81 (Bankr. S.D. Ohio 2012) (citation omitted).

the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud." *Att'y Gen. v. M.C.K., Inc.*, 736 N.E.2d 373, 381 n.19 (Mass. 2000) (citing *Pepsi–Cola Metro. Bottling Co.*, 754 F.2d at 14–16 "(categorizing criteria set forth in My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 233 N.E.2d 748 [1968])");; *Evans v. Multicon Constr. Corp.*, 574 N.E.2d 395, 398 (Mass. App. Ct. 1991).

O'Beirne asserts that there are no facts that support the Trustee's position that she should be held to be the alter ego of the Debtor or SPM. O'Beirne was never an owner of the Debtor. O'Beirne SOF ¶¶ 8, 10. O'Beirne did not exercise any control over the Debtor or SPM, did not participate in any of the operations or management of the Debtor or SPM, and was not a signatory on the Debtor's bank account or have access to any corporate card. O'Beirne SOF ¶¶ 12–13, 18–19. She argues that the fact that she provided funding for the Debtor and capital for SPM "does not translate to intermingling of funds between the Debtor, SPM, and Ms. O'Beirne. Rather, it demonstrates that the assets were not intermingled and Mr. O'Beirne had to specifically request funds from Ms. O'Beirne." SJ Mot. 16.

Without citation to the record, the Trustee asserts in his opposition that facts in the summary judgment record would support findings that many of the *My Bread Baking Co.* factors have been met. Trustee Opp. 12–14. In the Trustee's SOF, the Trustee does dispute (with citation to the record) many of the facts stated as "undisputed" by O'Beirne in support of her request for summary judgment on this Count. Trustee SOF at 3–10, ¶¶ 8–32. On the gating issue of whether O'Beirne was even a member of the Debtor, O'Beirne denies ever having a membership interest and cites to her husband's deposition testimony that he has always been the only member of the Debtor. O'Beirne SOF ¶¶ 8, 10. It appears undisputed that the Debtor did not have an operating agreement or other governing documents and did not issue membership certificates. Trustee SOF at 3, ¶ 8. The Trustee cites to deposition testimony where O'Beirne

could not recall whether she was a "shareholder" of the Debtor.  *Id.* at 3–4, ¶ 8 (citing O'Beirne

Dep. 83:9-10).  The Trustee also cites to deposition testimony by the O'Beirnes' accountant,

George Tisdale, where he authenticated a handwritten note as something that he wrote on a 2016

profit and loss statement of "Sudbury Home Improvement & Construction"[10] indicating that a

payment of $131,150 under "Other Income" was "Due to S/H."  *Id.* (citing Reiling Decl., Ex. B,

George L. Tisdale Dep. Tr., August 26, 2020 ("Tisdale Dep."), at 73:1-22); *see also* Reiling

Decl. Ex. O.  Tisdale further testified that he did not write the note in the left column of the same

document that appears to state that the $131,150 of "Other Income" was received from O'Beirne

as "Bail Out Money."  Tisdale Dep. 73:1-12; *see* Reiling Decl., Ex. O.  O'Beirne argues that this

statement is hearsay that should not be considered by the Court and, even if it were considered,

that the testimony does not support a finding that O'Beirne was a member of the Debtor.

Because I agree that at least the handwritten note in the left column is hearsay and the testimony

of Tisdale regarding his note, and any reasonable inference therefrom, does not create a genuine

issue of material fact as to whether O'Beirne was a member of the Debtor, I do not need to reach

the hearsay issue regarding Tisdale's note.

    The Trustee also cites to evidence in the record that O'Beirne provided money to support

operations of the Debtor, she signed a personal guaranty of a bank line of credit for the Debtor,

she was listed in a filing with the secretary of state as having signing authority for the Debtor,

and both Padraig O'Beirne and O'Beirne characterized funds advanced by O'Beirne as

"investments."  Trustee SOF at 5–8, ¶¶ 12–23.  The guaranty executed by O'Beirne contains an

acknowledgment that she "is affiliated with [the Debtor], and as such, shall be benefited directly

---

[10] No party addresses that this profit and loss statement is captioned as being for "Sudbury Home Improvement &
Construction" or the connection of that name to the Debtor, but all parties reference this document as applying to the
Debtor and, for purposes of this Memorandum, it has been considered by the Court as being associated with the
Debtor.

by the [loan] transaction."  Reiling Decl., Ex. T.  O'Beirne "cashed . . . out" a 401(k) account to

make the down payment on the Boston Post Road property owned by the Debtor.  O'Beirne Dep.

at 58–63.  O'Beirne testified that she asked the Debtor to repay the funds advanced for the down

payment because the Boston Post Road building was an "investment" for her.  *Id.* at 63–64.  She

did not know if she was on the deed for the property and kept a notebook reflecting "monies that

[she] put in to buy the building."  *Id.* at 64.

O'Beirne asserts that she was never a manager and never had control of the Debtor.  The

Trustee cites evidence in the record that in 2014 O'Beirne represented herself to be a "Manager"

of the Debtor when signing a mortgage note and commitment letter relating to the Boston Post

Road property on behalf of the Debtor; she likewise accepted the lending bank's commitment

letter as the "duly authorized" representative of Debtor and handwrote "MGR" next to her

signature.  Reiling Decl., Exs. S and Ex. JJ.  The Trustee cites to other evidence of participation

in the business of the Debtor:

> She was likewise directly involved in the decision to purchase Debtor's primary
> asset, the Boston Post Road Property[], which she described as an "investment"
> for her.  ([O'Beirne] Dep. at 63:1-22).  Further, Ms. O'Beirne claims that she was
> directly involved in MPAC's financial affairs as she: (a) paid the down payment
> on the Boston Post Road Property (*Id.* at 62:19-24); (b) paid Debtor contractors
> directly ([Reiling Decl., Ex. D, Padraig O'Beirne Dep. Tr., October 28, 2022 ("P.
> O'Beirne 2022 Dep."),] at 102:3-7); (c) used her personal credit card to pay
> Debtor's obligations ([O'Beirne] Dep. at 123:49; 124:20-23); (d) personally paid
> $75,000.00 toward the Debtor's project for James LaPlante and Deborah Race (*Id.*
> at 107:18-24); and (e) and made hundreds of thousands of dollars of payments to
> the company, which Mr. O'Beirne characterized as her "investment" in Debtor.
> ([Reiling Decl., Ex. A, Padraig O'Beirne Dep. Tr., September 1, 2020 ("P.
> O'Beirne 2020 Dep."),] at 96:17-23).

Trustee SOF at 5, ¶ 12.

With respect to SPM, O'Beirne asserts that she exercised no control, was never a

manager, officer, or director, did not participate in the management or operations, and that the

entity was not run for her personal benefit.  SJ Mot. 16–17; O'Beirne SOF ¶¶ 29–30.  She admits

that she "provided . . . capital" to SPM and had a fifty percent ownership interest in the entity.

SJ Motion 16; O'Beirne SOF ¶ 27.  The Trustee refers to Padraig O'Beirne's deposition

testimony that identified both the O'Beirnes as the only "officers and members" of SPM.

Trustee SOF at 9, ¶ 29 (citing P. O'Beirne 2022 Dep. 81:2-9).  To dispute her statement that

"Mr. O'Beirne always managed SPM's day-to-day operations," the Trustee argues "there is

evidence that O'Beirne maintained the Debtor's books[.]"  Trustee SOF at 9, ¶ 28.  It is unclear

how O'Beirne's bookkeeping for the Debtor supports a finding that she controlled or managed

SPM.  The Trustee also points out, however, that she "was personally involved in the purchase of

the Main Street Property" and "the Debtor paid the down payment . . . in the amount of

$308,000.00."  *Id.* at 9, ¶¶ 26, 28; Reiling Decl., *see* Ex. KK.  Although the Main Street property

was "titled in the name of SPM" and evidence shows the Debtor made mortgage payments on the

property, it was understood as an investment for O'Beirne, O'Beirne testified to making the

down payment, and the profit and loss for the property was reported on the O'Beirnes' federal

income tax returns in 2017, 2018, and 2019.  Trustee SOF at 21, ¶¶ 32–37; P. O'Beirne 2020

Dep. 182:11-21; O'Beirne Dep. 14:19-23; Tisdale Dep. 82.  O'Beirne testified that she did not

know why the Debtor made mortgage payments on the Main Street property.  O'Beirne Dep.

91:16–92:3.

I do not assess whether the evidence of whether O'Beirne was a member or manager of

the Debtor and SPM will ultimately result in findings at trial.  I must assess whether the evidence

in the record cited by the Trustee rises above a mere scintilla such that, with reasonable

inferences taken in favor of the Trustee, the evidence could support the claim asserted by the

Trustee.  *See Irobe v. U.S. Dep't of Agric.*, 890 F.3d 371, 380–81 (1st Cir. 2018) (quoting *Liberty

Lobby*, 477 U.S. at 252) (existence of a mere "scintilla" of evidence in support of plaintiff's

position is not enough to ward off summary judgment where plaintiff has burden of proof).

While a close call, the evidence on these *My Bread Baking Co.* factors, with reasonable

inferences made, could allow a finding for the Trustee at trial and demonstrate a genuine issue of

material fact.   SJ Motion is denied as it relates to Count IX.

### D.  Breach of Fiduciary Duty/Corporate Waste (Count X)

In Massachusetts, the directors and officers of a corporation stand in a fiduciary

relationship to that corporation.  *Demoulas v. Demoulas Super Mkts., Inc*., 677 N.E.2d 159, 179

(Mass. 1997) (citation omitted).  Similarly, "the manager of a limited liability company owes a

fiduciary duty to the company." *Cruickshank v. Casey (In re Bos. Grand Prix, LLC)*, 624 B.R. 1,

19 (Bankr. D. Mass. 2020) (citing *Martin v. Martin*, No. 1784CV00442, 2019 WL 4546584, at

*6, (Mass. Super. Apr. 18, 2019)).  "Fiduciary duties of members of a closely held LLC are

essentially the same as those of shareholders of a closely held corporation."  *Id.* (citing *Butler v.

Moore*, No. 10-10207, 2015 WL 1409676, at *60–61 (D. Mass. Mar. 26, 2015)).  "When a

director or officer removes or diverts corporate assets for which the corporation receives no or

inadequate benefit, that director or officer breaches his or her duty of loyalty and is liable for

waste of corporate assets."  *Id.* (citing *Coggins v. New England Patriots Football Club, Inc.*, 492

N.E.2d 1112, 1120 (Mass. 1986)).  "Each transfer of corporate funds for personal benefit that

serves no corporate interest causes unfairness to the corporation; each such transfer constitutes a

breach of fiduciary duty."  *Id.* (citation omitted).

In order to prove a claim against O'Beirne for breach of fiduciary duty, the Trustee must

establish "(1) the existence of a duty of a fiduciary nature, based upon the relationship of the

parties, (2) breach of that duty, and (3) a causal relationship between that breach and some

resulting harm to the plaintiff." *Amorim Holding Financeria, S.G.P.S., S.A. v. C.P. Baker &

Co.*, 53 F.Supp.3d 279, 295 (D. Mass 2014) (citing *Hanover Ins. Co. v. Sutton*, 705 N.E.2d 279,

288–89 (Mass. App. Ct. 1999)).  O'Beirne asserts:

The undisputable evidence in this case is that Ms. O'Beirne was not involved in any way in the management or operation of the Debtor. [O'Beirne] SOF ¶¶ 12, 13. Ms. O'Beirne, a research scientist with a full time job and the primary care giver for four (4) children, simply did not have the time to be involved in the Debtor's operations. [O'Beirne] SOF ¶ 15. Mr. O'Beirne did not consult Ms. O'Beirne about the Debtor's management or operations, or about any of the transfers challenged by the Trustee, except for the Tax [] Transfers. [O'Beirne] SOF ¶ 14. Ms. O'Beirne was not an officer or a director of the Debtor. [O'Beirne] SOF ¶ 11. There is simply no evidence of *any* relationship between the Debtor and Ms. O'Beirne, much less a fiduciary relationship. The mere fact that the O'Beirnes are married to each other is insufficient to establish a fiduciary relationship with Mr. O'Beirne, much less the Debtor.

SJ Mot. at 18 (emphasis in original). The Trustee asserts that the record reflects that O'Beirne held herself out as the Debtor's "manager"; was personally involved in the purchase of both the Boston Post Road property and Main Street property; personally guaranteed the debts of both entities; "invested" hundreds of thousands of dollars in the Debtor; paid contractors and funded projects for the Debtor; and personally received distributions from Debtor while Debtor was insolvent, in litigation, and preparing for its eventual bankruptcy filing.[11] Trustee Opp. 16; Trustee SOF at 45, ¶¶ 9, 12.

The evidence cited by the Trustee, with reasonable inferences taken in his favor, must show that O'Beirne had a fiduciary duty to the Debtor at the time of the Transfers and acted in violation of that duty. While the evidence could support an inference that O'Beirne was a manager of the Debtor in and around 2014, the Trustee cites no other evidence that would support that inference for the relevant period starting in 2018. Moreover, the Trustee has not proffered any evidence of O'Beirne taking action as a "manager" or in another fiduciary role, or otherwise contributing to the waste of corporate assets. Personal guaranties from 2014, funding cash needs of the Debtor, "investing" in a building purchased by the Debtor, and receiving distributions from the Debtor may be evidence of involvement with the business of the Debtor,

---

[11] The Trustee has also pointed to hearsay evidence where O'Beirne's husband allegedly told clients that she was in the Debtor's office doing bookkeeping that is addressed in the Motion to Strike. For purposes of this SJ Motion, I grant the Motion to Strike as to these statements and have not considered the testimony.

but do not give rise to any fiduciary duty. Even if the Trustee establishes that O'Beirne is a member of the Debtor, *see* discussion *supra* Part II(C), the evidence cited by the Trustee does not refute O'Beirne's affidavit that she had no active role in approving or making any of the Transfers made by the Debtor. Here, the evidence proffered by the Trustee does not rise above a scintilla as is required to survive a motion for summary judgment. *See Irobe*, 890 F.3d at 380–81. The SJ Motion is granted as to Count X.

### III.    CONCLUSION

For the reasons stated, I grant in part and deny in part the SJ Motion as follows:

(i)    grant summary judgment in favor of O'Beirne on Counts VII (unjust enrichment) and X (breach of fiduciary duty/corporate waste) and partially grant summary judgment on Counts I–VI (the avoidance of allegedly fraudulent transfers, based on both actual and constructive fraud, and recovery of such transfers under § 550) regarding the transfers associated with Padraig O'Beirne's credit cards, the Personal Expense Transfers, and the SPM Transfers; and

(ii)    deny summary judgment on Count IX (alter ego) and partially deny summary judgment on Counts I–VI as to the other transfers discussed herein.

I also grant in part and deny in part the Motion to Strike and deny the Cross-Motion to Strike as described above.

By the Court,

Dated: April 1, 2024

_____
Christopher J. Panos
United States Bankruptcy Judge